IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| LINDA M. JOHNSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 05-3380-CV-W-HFS |
| ) | |
| JO ANNE B. BARNHART, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM AND ORDER**

I.   **Procedural Background**

On October 6, 2003, plaintiff applied for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401, et seq. (Tr. 40-52). Plaintiff claimed a disability onset date of December 31, 1999, due to severe myofascial pain; fibromyalgia; post traumatic stress disorder; osteoarthritis; osteoporosis; and difficulty concentrating. (Tr. 63). Plaintiff's application was denied, and she timely requested a hearing. A hearing was held on January 21, 2005, before an Administrative Law Judge "ALJ" (Tr. 204-38). By a decision dated April 6, 2005, the ALJ determined that plaintiff suffered from severe impairments including thoracic regional myofascial pain syndrome, degenerative osteoarthritis, and degenerative joint disease of the knees. (Tr. 19). The history of diagnosis of osteoporosis and eczema affecting the right axilla and anxiety disorder were not found to be severe. (Tr. 14). The ALJ further determined that plaintiff retained the residual functional capacity "RFC" to perform her past relevant work as a telephone solicitor, and,

alternatively, other light unskilled work existing in significant numbers in the regional and national economy. (Tr. 20). For the reasons set forth herein, the decision of the ALJ is reversed.

## II.    Factual Background

The facts as set forth in the parties' briefs will be merely summarized here.

Plaintiff's Testimony

At the time of the hearing, plaintiff was 52 years of age, she completed college and obtained a Master's Degree, she was 5' 2" tall, and weighed 130 pounds. (Tr. 210-11). Since 1992, plaintiff has periodically used a walker or a cane, but is able to walk her dog without assistance from either. (Tr. 211).

Plaintiff's husband is blind, and she takes care of him full time, but they have support services, i.e. meals on wheels, and a cleaning service. (Tr. 213-14). Plaintiff heats up the food, dishes it out, and serves it to her husband. (Tr. 214). Plaintiff previously worked as a teacher with the Cincinnati Association for the Blind, and supervised a small staff. (Tr. 215). She taught visually impaired students Braille, communication skills, and daily living skills. (Id). Plaintiff also worked for a short time with the Cincinnati Symphony Orchestra in a telemarketing position. (Tr. 215-16).

Since the 1980's, plaintiff has experienced problems sitting due to back pain; the only relief is to lie down for 15 to 20 minutes. (Tr. 217-18). Sometimes, while driving, plaintiff stops the car, and lies flat on her back on the back seat for approximately 30 minutes. (Tr. 219). Her previous employer was aware of her back problems and brought a special chair to accommodate her. (Id). She left her employment in 1994, and in 1996, she came to Missouri to care for her husband. (Tr. 220).

Plaintiff can sit for 15 to 20 minutes before she needs to lie down; usually 5 to 6 times a day. (Tr. 221, 227). Dr. Fetter was plaintiff's prior physician, and in 2000, she began treatment with Dr. McNay who prescribed Klonopin to help her sleep. (Tr. 22-23). Plaintiff has not had a full night's sleep in about 10 years. (Tr. 223). Recently, plaintiff has been assisted with support services to help with cleaning and grocery shopping. (Tr. 223-24). Sitting is the most difficult position for plaintiff; she can walk about ½ a mile with her walker or cane, and it takes about 40 minutes. (Tr. 224). Back in 1999, plaintiff could take a walk twice a day. (Tr. 225). At that time, while plaintiff was working she could forego her lunch break and lie down twice a day for 30 minutes. (Tr. 227-28). She could not work a normal work week during that time. (Tr. 228). Plaintiff had difficulty sitting in a chair to do paperwork, or talk on the phone. (Tr. 229). Plaintiff also has difficulty bending due to pain in the middle of her back. Although plaintiff claimed to be disabled in December of 1999, she did not file for disability benefits until October of 2003, because she tried to push herself and make certain accommodations, i.e lying down in the back seat of the car. (Tr. 229-30).

Vocational Expert Testimony

After reviewing plaintiff's vocational history, the vocational expert, George Horne, stated that plaintiff's work as a telephone solicitor was semi-skilled as described, and performed as sedentary. (Tr. 230-31). The DOT did not contain a vocation described as rehabilitation teacher, the closest association was orientation and mobility therapist for the blind. (Tr. 231). Mr. Horne described it as a skilled level position and light work, as performed, it was medium work. (Id).

The ALJ asked Mr. Horne to assume an individual 48 to 53 years of age, with a high school plus education, with impairments including arthritis defined as a history of diagnoses of
3

degenerative joint disease affecting the knee, degenerative arthritis diagnosed as a thoracic region and myofascial pain syndrome; a history of a diagnosis of osteoporosis; anxiety disorder; and a history of eczema affecting the right axilla. (Tr. 231-32). The vocational expert was also asked to assume that as a result of these impairments, the individual could perform no more than light work, secondary to orthopaedic impairments, including the need to walk and stand on even surfaces; no exposure to extreme cold or vibration; no overhead reaching with the right upper extremity, secondary to possible decreased mobility; and avoid exposure to unprotected heights, potentially dangerous machinery and commercial driving. (Tr. 232). Also, secondary to possible distractions from medical conditions, a need for simple to detailed, but not complex job instructions. (Id). The ALJ also required the vocational expert to consider only semi-skilled work. (Id). The vocational expert opined that such an individual could perform plaintiff's past relevant work as a telephone solicitor. (Tr. 233).

The ALJ then inquired that if such an individual could not perform such work, whether any skills obtained in past work could transfer to other jobs. (Id). The vocational expert testified that one would only be left with unskilled work. (Id). Examples of such work included small product assembler of which there were over 20,000 positions in Missouri and over 680,000 in the national economy. (Id). Also, a cashier II of which there were over 31,000 positions in Missouri and over 1 and ½ million in the national economy. (Tr. 233-34).

The ALJ next asked the vocational expert to assume that the individual was unable to sustain up to 8 hours of sitting, standing, and walking at any exertional level, and that due to medical conditions, was unable to sustain up to 2 hours of attention and concentration. (Tr. 234). The vocational expert testified that there would be no competitive work for such an individual. (Id).

4

The ALJ asked that considering the age change during the period of consideration, if he were to find the existence of sedentary work without skills transfer, would there be any skills or semi-skills obtained in past work that would transfer to sedentary work. (Id). The vocational expert testified that there would not. (Id).

Plaintiff's attorney asked the vocational expert to assume the first hypothetical person with the additional need to lie down 5 to 6 times a day for 20 minutes. (Tr. 235). The vocational expert opined that there were no jobs such a person could perform. (Id).

Plaintiff's attorney then asked the vocational expert whether the person in the third hypothetical who could perform small parts assembler and cashier I, but was unable to bend and could not sit for more than 15 minutes could perform those jobs. (Id). The vocational expert testified that the assembly job permitted working at a height that would not require bending. (Tr. 235-36).

Plaintiff then noted that she had been diagnosed with chronic tendonitis in her shoulder and received therapy for it, but it decreased her ability to handle small objects with her left hand. (Tr. 236-37). The vocational expert testified that since the jobs elicited required bilateral manual dexterity, in view of this impairment, those jobs would be precluded. (Tr. 237).

### III. Standard of Review

When the ALJ's findings are supported by substantial evidence on the record as a whole, they will be affirmed. Forehand v. Barnhart, 364 F.3d 984, 986 (8th Cir. 2004).To assess the ALJ's decision, evidence that both supports the decision as well as evidence that detracts from it must be considered. Forehand, at 986. The court "should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." Forehand, at 986; quoting, Hildebrand v. Barnhart,

302 F.3d 836, 838 (8th Cir. 2002).

**IV.   Analysis**

The issue at hand is whether there is substantial evidence based on the whole record to support the ALJ's conclusion that plaintiff can perform her past relevant work as a telephone solicitor, or other work in the light, unskilled category. Forehand, at 986. That being said, it is noted that the ALJ relied, in some measure, on the lack of medical evidence illustrating plaintiff's alleged impairments prior to date plaintiff was last insured, i.e. March 31, 2000. (Tr. 16). To be sure, in order to have insured status under the Social Security Act, an individual is required to have twenty quarters of coverage in each forty-quarter period ending with the first quarter of disability. Fisher v. Shalala, 41 F.3d 1261, 1262 (8th Cir. 1994); citing, 42 U.S.C. § 416(i)(3)(B).

Nevertheless, while it cannot be the sole evidence of disability, retrospective medical diagnoses constitute relevant evidence concerning the degree of disability prior to expiration of the insured period. List v. Apfel, 169 F.3d 1148, 1149 (8th Cir. 1999); see also, Fowler v. Bowen, 866 F.2d 249, 252 (8th Cir. 1989) (subsequent medical, psychological, and psychiatric evaluations are relevant to the extent they reflect upon a claimant's condition as of that date, and these subsequent reports must be considered as part of a proper evaluation). Consequently, the medical evidence of record dating throughout the latter part of 2000, through 2003, will be considered.

Credibility

Plaintiff contends that the ALJ erred in finding her allegations of pain not fully credible, and in assessing her RFC. Included in an RFC determination is an assessment of plaintiff's credibility.

6

In assessing a plaintiff's credibility, the ALJ must consider all of the evidence, including prior work records and observations by third parties and doctors regarding daily activities, the duration, frequency, and intensity of pain, precipitating and aggravating factors, the dosage, effectiveness, and side effects of medication, and functional restrictions. Lowe v. Apfel, 226 F.3d 969, 971-72 (8th Cir. 2000).

The ALJ found plaintiff's testimony to be less than credible due to her ability to care for her disabled husband, in addition to taking care of her own personal needs, pay bills, do laundry, light housekeeping, drive, and run errands to the bank and post office. (Tr. 16). However, it has been consistently held that, in the context of a fibromyalgia case, the ability to engage in some life activities does not support a finding that a plaintiff retains the ability to work. Forehand, 364 F.3d at 988. In order to conclude that a plaintiff has the RFC necessary to be able to work, it must be determined whether he or she has "the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Forehand, at 988.

The ALJ properly credited plaintiff's work record, and noted that plaintiff's solid earnings history showed some motivation to engage in productive activity. O'Donnell v. Barnhart, 318 F.3d 811, 817 (8th Cir. 2003) (a substantial record of responsible jobs supports a claimant's credibility); see also, Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000).

However, as previously noted, in considering the medical evidence, the ALJ relied primarily on records established during the relevant period and found it to be inconsistent with plaintiff's allegations of pain. (Tr. 16). In other instances, when considering reports generated after the insured period, the ALJ relied on only those portions that suggested improved conditions. For example, the

7

ALJ noted that on May 1, 2000, Dr. Jennifer McNay stated that plaintiff's osteopenia[1] was improving and her anxiety was controlled by Klonopin. (Tr. 16, 124). Yet, the ALJ failed to consider Dr. McNay's notes indicating that notwithstanding the improvement of her bone density, plaintiff's medical history is significant for osteoarthritis which primarily affected her knees. (Tr. 124). The ALJ also did not take notice that plaintiff has attempted to resolve her anxiety problems, including traveling some distance for an evaluation, and although Klonopin has been helpful, plaintiff will need life long therapy. (Id). The ALJ noted that although current medical records documented progression of plaintiff's impairments, they still failed to support functional limitations greater than those set forth during the relevant period. (Tr. 16).

The ALJ found that the fact that plaintiff did not file an application for disability until 2003, was further proof that her pain was more serious at that time as opposed to any pain experienced during the relevant period. Plaintiff complains that these conclusions on the part of the ALJ were improper. I disagree. For, it is undisputed that the medical evidence of plaintiff's impairments as of 1999, were not as severe as more recent reports. Talley v. Barnhart, 113 Fed.Appx. 185, 187 (8th Cir. 2004).

However, contrary to the ALJ's opinion, plaintiff's consideration of returning to work could very well indicate a willingness to attempt work, rather absence of disability. Brosnahan v. Barnhart, 336 F.3d 671, 677 (8th Cir. 2003) (willingness to return to work showed nothing more than a good-faith attempt to return to work, and does not diminish credibility).

The ALJ did not discuss methodically each Polaski consideration, but it appears he

---

[1]Reduced bone mass due to a decrease in the rate of osteoid synthesis to a level insufficient to compensate normal bone lysis. *Dorland's Illustrated Medical Dictionary, 25th ed., pg. 1107.*

8

acknowledged and examined those considerations before discounting plaintiff's subjective complaints. Lowe, at 972. Where there is evidence which both detracts from as well as supports the ALJ's credibility findings, the ALJ's determination should be accepted, even though the reviewing court might be inclined to accept the claim.

Residual Functional Capacity

The RFC "is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." Brewster v. Barnhart, 366 F.Supp.2d 858, 874 (E.D.Mo. 2005). The determination of RFC is a medical issue which requires the consideration of supporting evidence from a medical professional. Brewster, at 874.

Here, the ALJ concluded that plaintiff retained the RFC to lift and carry 20 pounds occasionally and 10 pounds frequently; was able to sit, stand, and walk for 6 hours a day with normal breaks within an 8 hour work day; and secondary to possible limited mobility, she was unable to perform work involving exposure to significant unprotected heights or exposure to potentially dangerous machinery or to perform commercial driving. (Tr. 17). The ALJ also concluded that plaintiff should avoid exposure to extreme cold; that she was limited to work performed in a climate-controlled environment; and was unable to perform overhead reaching with the right upper extremity. (Id). Plaintiff was also limited to work performed on an even surface and involved no exposure to extreme vibration, these limitations were secondary to her orthopaedic impairments; and she was limited to work involving simple to detailed, but not complex job instructions, these limitations were secondary to distraction from medical conditions. (Id).

In reaching this finding, the ALJ stated that the medical records did not support plaintiff's

9

allegation of disability on or before March 31, 2000, and he relied, in large measure, on portions of the medical records noted above. Contrary to this finding, when the entire medical evidence on the record as a whole is considered, the ALJ's finding was not based on substantial evidence.

The initial medical evidence shows that on March 5, 1998, plaintiff presented to Dr. Shanti S. Yerra with complaints of pain in her lower and mid-thoracic region, accompanied by pain when engaged in bending or prolonged sitting. (Tr. 194). Dr. Yerra diagnosed acute exacerbation of back pain, and suggested treatment consisting of exercises, muscle relaxants and non-steroidal, anti-inflammatory drugs. (Id). On April 22, 1998, plaintiff began treatment with Dr. Barbara Fedor, and complained of severe thoracic lumbar progressive pain. (Tr. 192). Due to the severe pain, and the family history of osteoporosis, Dr. Fedor recommended a bone density test and an x-ray. (Tr. 190). On May 4, 1998, Dr. Fedor's notes revealed that plaintiff was compliant with performing weight bearing exercises, and was encouraged to continue. (Tr. 189). Subsequent to the x-ray results, Dr. Fedor diagnosed plaintiff with scoliosis, thoracic spine area with myalgia, and discussed with plaintiff the progression of the disease. (Tr. 185). By April 13, 1999, Dr. Fedor added an additional diagnosis including osteoarthritis of the lumbar, osteoporosis, and degenerative joint disease-bilateral hands. (Tr. 182).

On January 21, 2000, plaintiff began treatment with Dr. Mark J. Jarek who found minimal degenerative changes appreciated in the hands with preserved hand functions. (Tr. 114). Further examination revealed marked tenderness over the thoracic spine from T4 through L1. (Tr. 115). Dr. Jarek's assessment included osteoporosis, thoracic regional myofascial pain syndrome, perhaps due in part to mild degenerative arthritis, and probable mild knee osteoarthritis. (Id). He prescribed Vicodin, and scheduled another bone density test. (Id).

10

The balance of the medical evidence post-dates the insured period, but should be considered because it demonstrates the progressive deterioration of plaintiff's impairments, and reflects upon plaintiff's condition prior to expiration of insured status. Fowler, 866 F.2d at 252. That being said, on May 9, 2001, during a follow-up visit for degenerative arthritis and fibromyalgia, Dr. Jarek assessed mild osteoarthritis changes of plaintiff's hands, and prescribed Hydrocodone with a caution about dependence. (Tr. 111-12). During an exam on July 18, 2002, plaintiff had severe diffuse myofascial pain and moaned when touched anywhere on her back, shoulders, or neck region. (Tr. 108). This diagnosis was repeated throughout exams during 2002, and during a visit on January 27, 2003, Dr. Jarek noted that plaintiff was unable to care for her husband as in the past, but continued to decline Home Care Services[2]. (Tr. 103).

Similarly, on May 23, 2001, Dr. McNay noted that plaintiff had osteoarthritis and "significant problems," and that she had been through all of the non-steroidal anti-inflammatory medications. (Tr. 121). On November 22, 2002, Dr. McNay noted that plaintiff had fibromyalgia at a baseline accompanied by increased pain, and that her insurance refused to pay for entry into a Fibromyalgia Clinic. (Tr. 118).

During a more recent examination on November 26, 2003, Dr. McNay expressed concern about plaintiff's level of pain, and diagnosed severe fibromyalgia; she also noted the multitude of medications plaintiff had tried in an attempt to alleviate her pain. (Tr. 163-64). On January 13, 2004, and on February 27, 2004, Dr. McNay's notes reflect that plaintiff's fibromyalgia had become debilitating. (Tr. 158, 162).

---

[2]During a visit on October 10, 2002, Dr. Jarek noted that while plaintiff was quite stressed with taking care of her husband, "she is quite stoic and refuses to admit she needs help." (Tr. 105).

The medical evidence as a whole supports plaintiff's allegations of pain; there seems to be little or no support for a contrary conclusion. The numerous visits to treating physicians, as well as the various medications prescribed , and plaintiff's attempts resolve her pain also support her credibility. O'Donnell, 318 F.3d at 817; citing, Cox v. Apfel, 160 F.3d 1203, 1208 (8th Cir. 1998) (consistent diagnosis of chronic pain, coupled with a long history of pain management and drug therapy is an objective medical fact supporting a claimant's allegations of disabling pain). When the ALJ asked the vocational expert to assume he found plaintiff's allegations credible, the vocational expert testified that all competitive work would be precluded. (Tr. 234).

In view of the ALJ's failure to properly credit plaintiff's subjective complaints of pain, and the failure to properly assess plaintiff's RFC, the hypothetical question posed to the vocational expert did not adequately reflect plaintiff's impairments. Singh, at 453. Thus, the testimony of the vocational expert that plaintiff could perform her past relevant work as a telephone solicitor, or, alternatively, could perform other work which exists in the national economy, cannot constitute substantial evidence on the record as a whole. Id. This case will therefore be remanded for further development of the medical evidence post-dating the insured period and for a reevaluation of plaintiff's subjective complaints and testimony[3] as well as plaintiff's ability to perform past work or any other work in light of her impairments. O'Donnell, at 819.

Accordingly, it is hereby

ORDERED that plaintiff's request for judgment is GRANTED, and the decision of the

---

[3] A critical issue would seem to be the credibility of plaintiff's need for frequent breaks in her activities, to lie down or otherwise relieve her pain. A close review of medical reports of such a practice–or the absence of such notations–may be significant. Medical recommendations–or the lack thereof–may also be pertinent to a factor that may control the conclusion of ability to work.

Commissioner of Social Security is REVERSED. The above captioned case is REMANDED to the Commissioner for reconsideration consistent with this opinion, pursuant to 42 U.S.C. § 405(g). The clerk is directed to enter judgment in favor of plaintiff.

        /s/ Howard F. Sachs
         HOWARD F. SACHS
         UNITED STATES DISTRICT JUDGE

September 27, 2006

Kansas City, Missouri